# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### EASTERN DIVISION

REGINALD DUNAHUE,                                                    PLAINTIFF
ADC #106911


v.                             5:16CV00144 KGB/JTR


JAMES PLUMMER, Lieutenant,
Varner Super Max Unit, ADC, *et al.*                           DEFENDANTS


## <u>RECOMMENDED DISPOSITION</u>

This Recommended Disposition has been sent to United States District Judge

Kristine G. Baker. The parties may file written objections to any of these

recommendations. However, those objections must be specific and identify the facts

or law that are being challenged. An objection to a factual finding must specifically

identify the contested finding of fact and describe the evidence that supports it being

erroneous.

An original and one copy of the objections must be received by the Clerk of

this Court within fourteen (14) days of this Recommendation. If no objections are

filed, Judge Baker can adopt this Recommendation without independently reviewing

all of the evidence in the record. By not objecting, you may also waive any right to

appeal questions of fact.

## I.    Introduction

On July 11, 2016, Plaintiff, Reginald Dunahue ("Dunahue") initiated this §
1983 action, alleging that, on July 19, 2015, his constitutional rights were violated
during and after his forced extraction from a punitive isolation cell in Varner
Supermax ("VSM"). In Dunahue's Substituted Complaint,[1] he specifically alleges
that: (1) Defendants Lieutenant John Herrington ("Lt. Herrington"), Lieutenant
James Plummer ("Lt. Plummer"), and Sergeant Sedrick Foote ("Sgt. Foote")
(referred to collectively as "Defendants") used pepper spray and tear gas, which was
authorized by Defendant Lasaundra Malone ("Major Malone"), in a way that
constituted excessive force; (2) Defendants were deliberately indifferent to his need
to have his handcuffs removed so he could adequately "decontaminate" in the
shower; (3) Defendants refused to provide him with medical care after the incident;
(4) Defendants subjected him to inhumane conditions of confinement by returning
him to his cell, without it being cleaned of chemical residue; (5) Defendants and
Major Malone subjected him to inhumane conditions of confinement by placing him
on an alternative meal plan for seven consecutive days after the incident, during

---

[1] On June 28, 2016, the Court struck Dunahue's original Complaint because it included
numerous factually and legally unrelated claims, in violation of Fed. R. Civ. P. 20. *Doc. 6*. Despite
the Court's instruction to file a Substituted Complaint that included only factually and legally
related claims, Dunahue's Substituted Complaint raised several vague claims that were unrelated
to the July 19, 2015 incident. *Doc. 7*. On January 23, 2018, the Court entered an Order dismissing,
without prejudice, those unrelated and improperly joined claims. *Doc. 57*. He was allowed to
proceed with his claims related to the July 19, 2015 cell extraction.

which time he was fed only a "nutritional loaf" in place of his regular meals;[2] and (6) VSM Warden Randy Watson ("Warden Watson"), Deputy Warden Jeremy Andrews, and Deputy Warden Christopher Budnik knew about these constitutional violations, but failed to take corrective action. *Doc. 7*.

On September 5, 2017, I ordered service of the Substituted Complaint on all of the Defendants. *Doc. 16*. In their Answers, all of the Defendants denied Dunahue's allegations. *Docs. 42 and 65*.

On October 24, 2017, Warden Watson, Deputy Warden Budnik, Deputy Warden Andrews, Lt. Plummer, and Major Malone filed a Motion for Partial Summary Judgment, alleging that Dunahue failed to exhaust his administrative remedies as to some or all of the claims he was asserting against them. *Docs. 32, 33, and 34*. On March 21, 2018, March 23, 2018, and April 5, 2018, Dunahue filed Responses. *Docs. 68, 69, and 73*.

On September 17, 2018, United States District Judge Kristine Baker adopted my Recommended Partial Disposition (*Doc. 92-1*) and ruled that Dunahue failed to properly exhaust his administrative remedies as to his: (1) corrective inaction claims against Defendants Warden Watson, Deputy Warden Budnik and Warden Andrews; and (2) his claim against Lt. Plummer for returning him to a cell that still contained

---

[2] In his Substituted Complaint, Dunahue refers to the "nutritional loaf" as "frozen cornbread." *Doc. 7 at 11*.

chemical residue. *Doc. 101*. Judge Baker allowed Dunahue to proceed with his remaining § 1983 claims, which include the following:

(1)  Defendants used excessive force during the July 19, 2015 cell extraction.[3]

(2)  Defendants were deliberately indifferent to Dunahue's need to have his handcuffs removed so he could adequately "decontaminate" in the shower.

(3)  Defendants were deliberately indifferent to Dunahue's need for medical attention after the incident.

(4)  Lt. Herrington and Sgt. Foote subjected Dunahue to inhumane conditions of confinement by returning him to his cell, before it was cleaned of chemical residue.

(5)  After the incident, Defendants and Major Malone placed Dunahue on an alternative meal plan for seven days, which deprived him of adequate nutrition.

*See Docs. 15-1, 57, 92-1, & 101*. As to each claim, Dunahue seeks damages against Defendants, in their individual capacities.

On November 6, 2018, the four remaining Defendants filed a Motion for Summary Judgment, a Brief in Support, and a Statement of Undisputed Material Facts, seeking the dismissal of Dunahue's claims. *Docs. 110, 111, and 112*.[4] In their

---

[3] Major Malone's role in the alleged use of excessive force was limited to authorizing Lt. Herrington to use pepper spray and, after it was not effective in getting Dunahue to obey his orders to cuff up, authorizing Lt. Herrington to use tear gas to get Dunahue to comply with those orders.

[4] Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50

Brief, they argue that, as to each of Dunahue's claims, qualified immunity shields them from liability. Accordingly, they contend that all of those claims should be dismissed, with prejudice.

In support of their position, Defendants have submitted: (1) a Declaration from Defendant Lt. Herrington (*Doc. 110-4*); (2) a Declaration from Warden Watson (*Doc. 110-5*); (3) VSM policies and procedures applicable to Dunahue's claims (*Docs. 110-6, 110-7, 110-8, 110-9*); (4) medical records reflecting that Dunahue received prompt medical attention after the incident (*Doc. 110-3*); and (5) *Extraction Videos 1, 2, 3, and 4, which show everything that took place during and after the use of force incident* (*Doc. 113*).[5]

Dunahue has filed a Response opposing Defendants' Motion for Summary Judgment, a Statement of Facts, and an accompanying Affidavit. *Docs. 117*, *118*, *119*. Defendants have filed a Reply. *Doc. 120*. Thus, all of the issues are joined and ready for disposition.

---

(1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. If that initial burden is sustained, the nonmoving party then must present specific facts demonstrating that there is a material dispute for trial. *See* Fed. R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

[5] In addition to these materials, Defendants rely on the following documents attached to their Motion for Summary Judgment: (1) the Incident Report Summary dated July 9, 2015, *Doc. 110-2*; and (2) Dunahue's Deposition, *Doc. 110-10*.

## II.    Important Contextual Facts

In September of 1995, at the age of seventeen, Dunahue was convicted of second degree murder in Saline County Circuit Court and sentenced to twenty years in the Arkansas Department of Correction ("ADC").[6] Dunahue spent most of the next twelve years incarcerated in VSM, where he received well over 100 major disciplinaries, many of which involved verbal and written threats to harm staff members; throwing or ejecting bodily fluids/excrement; destruction of state property; failure to obey orders of staff; battery; provoking or agitating fights; using abusive/obscene language; indecent exposure; and making sexual threats. *Doc. 110-5.*

On August 23, 2007, after serving twelve of the twenty years of his sentence, Dunahue was released on parole. *Id. at 43.* On April 22, 2008, his parole was revoked (*Doc. 110-5 at 43*) and he was returned to the ADC, based on pending charges of aggravated robbery in Pulaski County Circuit Court. On December 2, 2008, Dunahue was convicted of that crime and sentenced to 50 years, as a habitual offender. His current parole eligibility date is November 20, 2058.[7]

---

[6] *See* ADC website at https://apps.ark.org/inmate_info/index.php.

[7] *See* ADC website at https://apps.ark.org/inmate_info/index.php.

Between April of 2008, and January of 2012, Dunahue served most of his time in the East Arkansas Regional Maximum Security Unit ("EARMU"). On January 27, 2012, he was transferred back to VSM, where he remained through November 30, 2016, when he was returned to the EARMU. Suffice it to say, whether Dunahue was incarcerated in EARMU or VSM, he regularly received major disciplinary convictions, most of which involved violent, disruptive, and threatening behavior toward staff. As a result, he has served a considerable amount of time in isolation cells in VSM and EARMU.

Dunahue's complete disciplinary history, from September 24, 1997 through September 28, 2017, is attached as Exhibit 1 to the Declaration of Warden Watson. *Doc. 110-5*. As of September 28, 2017, Dunahue's disciplinary history spanned seventy-eight single spaced pages. *Doc. 110-5*. In his Declaration, Warden Watson describes Dunahue as having "an extremely disruptive and violent disciplinary history" and demonstrating "a chronic inability to conform his behavior to meet institutional expectations, policies, and procedures." *Doc. 110-5 at ¶¶ 4, 5*. He described Dunahue's conduct as creating "hazardous working environments for ADC employees," which resulted in VSM following "the highest safety protocols . . . when interacting with Inmate Dunahue." *Id. at ¶ 7*. Those "safety protocols" included the ADC taking the extraordinary step of advising "ADC staff . . . in January of 2015 that only [those holding the rank of] sergeants or above should have

7

contact with Dunahue due to his numerous threats to do bodily harm to staff." *Id. at ¶ 7.*

This "safety protocol" explains why *all* of the Defendants in this case are "officers" – one sergeant, two lieutenants, and one major – who have extensive experience dealing with the recalcitrant and difficult prisoners who are housed in VSM. In his Declaration, Warden Watson describes VSM's inmate population as "among the ADC's most incorrigible . . . ." Warden Watson's Declaration, *Doc. 110-5 at ¶ 3*. At the time of this incident, in July of 2015, Dunahue's disciplinary history suggests that he may have been one of the most dangerous and difficult to control prisoners in VSM.  Of course, regardless of his disciplinary history, Dunahue enjoys *the same constitutional rights and protections* as the best behaved prisoners in the ADC.[8]

These contextual facts are important to keep in mind as I state the material undisputed facts relevant to the July 15, 2019 incident and Dunahue's constitutional claims against the Defendants. My source for almost all of these undisputed facts, about which there is no genuine issue, comes directly from my careful review of

---

[8] Interestingly, the ADC's "special protocol" was designed to protect lower ranking guards by keeping them from interacting with Dunahue. However, it also helped protect Dunahue's constitutional rights by ensuring that *he* had no contact with less experienced guards, who might be more prone to overreact to Dunahue's routinely abusive behavior toward staff.

Extraction Videos 1 through 4, which I have now watched, in their entirety, *many times*.[9]

### III.    Material Facts About Which There Is "No Genuine Dispute"

#### A.    The Extraction of Dunahue From Isolation Cell 29 and His Trip to the Shower

1.      According to Dunahue, after Sgt. Foote denied him a lunch tray on July 19, 2015, he popped the sprinkler head in his isolation cell, causing it to flood. Affidavit of Dunahue, *Doc. 119 at 4*; Dunahue Dep., *Doc. 110-10 at 33*. Dunahue then refused orders to accept the cuffs so he could be removed from his flooded cell. Ext. V. #1.[10]

---

[9] On November 7, 2018, Extraction Videos 1, 2, 3, and 4 were filed under seal. Extraction Video 1 ("Ext. V. #1) is 21 seconds in length and shows Lt. Herrington explaining that Dunahue popped the sprinkler head in his isolation cell and is refusing to leave the flooded cell. As Lt. Herrington explains why the cell extraction is necessary, he is holding a red cannister of pepper spray.  Because Dunahue has refused orders to leave the cell, Lt. Herrington explains that he now must return to the cell and let Dunahue know force (pepper spray) will be used if he does not voluntarily agree to cuff up and leave the cell.

Extraction Video 2 ("Ext. V. #2) is 16 minutes and 5 seconds in length. It includes audio/video of the cell extraction, which ends with Dunahue being escorted to the shower.

Extraction Video 3 ("Ext. V. #3) is 11 minutes and 3 seconds in length. It includes audio/video of Dunahue leaving the shower, being escorted back to his cell, and then refusing to allow Lt. Herrington to remove his handcuffs, once he is back inside his cell.

Extraction Video 4 ("Ext. V. #4) is 2 minutes and 3 seconds in length. It includes audio/video of Lt. Herrington again returning to Dunahue's cell with pepper spray, but convincing him to cooperate and allow the handcuffs to be removed, *without* having to use pepper spray a second time. The video ends with Lt. Herrington removing Dunahue's handcuffs and closing the door to his cell, without having to use pepper spray.

[10] At the time of the incident, Dunahue was in Isolation Cell 29 in Area 4 of VSM. Dunahue Dep., *Doc. 110-10 at 32*; Incident Report Summary, *Doc. 110-2 at 23*. He had completed serving 21 of 30 days in punitive isolation for throwing bodily fluids in the direction of staff; failing to

2.      Before going to Dunahue's cell, Lt. Herrington spoke with Major Malone, who authorized him to use "Step 1" force, pepper spray, if Dunahue continued to refuse to obey orders to cuff up. *See* Lt. Herrington's Use of Force Report, dated July 19, 2015, at *Doc. 110-2 at 8.*[11] This explains why Lt. Herrington is holding a cannister of pepper spray in his left hand as he narrates Extraction Video 1, which is only 21 seconds in length and consists of him stating that he is about to go to Dunahue's flooded cell and remove him. Ext. V. #1 at 0:00 to 0:21.

3.      Extraction Video 2 begins with Lt. Herrington opening the outside solid steel door to Cell 29, and moving a three-sided plexiglass shield into position in front of the inside cell door, which is constructed of steel bars, and has a small rectangular opening called a "trap" for passing food trays, and cuffing and uncuffing prisoners. Lt. Herrington can be heard repeatedly ordering Dunahue to step to the trap and accept the cuffs so he can be removed from the cell. Ext. V. #2 at 0:10 to 1:12.

4.      The video makes it clear that Dunahue has made elaborate defensive preparations to protect himself from the pepper spray he knows Lt. Herrington will use if he defies his orders to cuff up. Dunahue has tied sheets to the bars, with only

---

obey staff; using abusive/obscene language; unauthorized use of state property; and failing to keep person or quarters in accordance with regulations.

[11] ADC administrative regulations specify that "the use of chemical agents . . . may be authorized only by a Unit Warden/Center Supervisor or his or her designee." Thus, Lt. Herrington was *required* to get Major Malone's prior approval at each step in his use of force during the cell extraction. *Doc. 110-8 at 1.*

a narrow opening for any spray to penetrate inside the cell. He is wearing glasses, a well-constructed paper face mask that covers his nose and mouth, and a shirt draped around his head and face. Ext. V. #2 at 0:24 to :0:35. His chest and legs are protected by his white prison pants and shirt. His protective gear is well thought out and designed to reduce, if not eliminate, his hair, skin, and eyes coming into contact with the chemicals he knows Lt. Herrington will use if he continues to disobey the orders to cuff up. *See* Ext. V. #2 at 0:00 to 0:35.

5.     As Lt. Herrington repeatedly orders Dunahue to "accept the cuffs," he responds by throwing a cup of liquid (probably urine) at Lt. Herrington's head. It splashes on the top of the plexiglass shield, but none of it reaches Lt. Herrington. Ext. V. #2 at 0:37.

6.     Lt. Herrington continues to repeat orders for Dunahue to take down the sheets and accept the cuffs. Dunahue refuses to comply with those orders and responds: "I have not seen lunch." Defendant Herrington then warns Dunahue that OC (pepper-spray) will be used if Dunahue does not obey his orders. Ext. V. #2 at 1:08.

7.     When Dunahue does not respond, Lt. Herrington sprays a one second or less burst of pepper spray. Ext. V. #2 at 1:13. The video shows this burst making a direct hit on one of the sheets, where a large circular orange stain is visible. Ext. V. #2 at 1:27. Some pepper spray also hit several bars near the trap and it can be

11

seen dripping down onto a solid metal plate below the bars.[12] Ext. V. #2 at 1:27. Dunahue appears to be hiding behind the sheets, in the back of his cell. This makes it extraordinarily unlikely that any of the pepper spray made direct contact with him. *See* Ext. V. #2 at 1:09 to 1:28.

8.    After discharging the short burst of pepper spray, Lt. Herrington closes the outside steel door to the cell. Over the next two minutes, Lt. Herrington, Lt. Plummer, and non-defendant Sgt. Brian Perkins wait outside the cell in the hallway for Dunahue to take the sheets down and indicate he is willing to accept the cuffs. Dunahue says nothing. The only sound he makes is an occasional cough, probably from breathing particles of the aerosolized pepper spray. After another minute of silence from inside the cell, it becomes clear the short burst of pepper spray was *not* sufficient to get Dunahue to surrender and cuff up. Lt. Herrington can be heard telling the other officers he is going to get "gas" and a mask. Ext. V. #2 at 3:36 to 3:45.

9.    Lt. Herrington is gone for about five minutes.[13] When he returns, he can be seen opening the outside door of Dunahue's cell and moving the plexiglass shield

---

[12] At 7:53, the Ext. V. #2 captures a clear view of the area hit by the short burst of pepper spray. This is indisputable evidence that little, if any, of the pepper spray made it inside Dunahue's cell.

[13] As indicated earlier, before Lt. Herrington used pepper spray he called Major Malone and obtained her authorization to use "Step 1" force. *Doc. 110-2 at 8*. Part of Lt. Herrington's delay in returning to the cell with the tear gas cannister was caused by the requirement that he place another call to Major Malone and obtain her permission to now use "Step 2" force, tear gas (CS), to convince Dunahue to cuff up and leave his flooded cell. *Id*.

in front of the trap. Ext. V. #2 at 9:11. Eight minutes has now elapsed since Lt. Herrington fired the short burst of pepper spray. During that time, Dunahue has *said nothing* from inside his cell. The only sounds he has made are occasional coughs, clearing his nose several times, and one sneeze. This is strong evidence that the short burst of pepper spray did not cause Dunahue much, if any, physical discomfort. Ext. V. #2 at 1:13 to 9:11.

10.    Once again, Lt. Herrington issues orders for Dunahue to accept the cuffs. He also warns Dunahue that he will release a cannister of CS (tear gas) if he does not obey his orders. Ext. V. #2 at 9:20. Lt. Herrington is wearing a gas mask and the tear gas cannister is in his right hand. Through the slit in the sheets, Dunahue can be seen standing in front of the door, with his hand pressing against his face mask, looking at Lt. Herrington. Ext. V. #2 at 9:45. After Dunahue fails to comply with Lt. Herrington's orders, he opens the cannister of tear gas and drops it into the cell. Ext. V. #2 at 9:53. Lt. Herrington then closes the outside steel door to Dunahue's cell and waits to see if the tear gas will work where the pepper spray has failed.

11.    Lt. Plummer and Sgt. Perkins, who are still in the hallway, begin to shout orders to Dunahue to strip down, take the sheets down from the bars, catch the cuffs, take his mask off, and surrender. Ext. V. #2 at 10:24. Dunahue responds by telling them several times to "say please." Ext. V. #2 at 11:00 to 11:09. For Dunahue

13

to issue a humorous taunt to their authority, as he stands in a cell filled with tear gas, suggests that "cell extraction" is a game that he enjoys playing. It also reflects the level of his hostility toward anyone giving him orders, regardless of how dire the consequences may be for disobeying them.

12.    After thirty more seconds, Dunahue begins to take down the sheets and removes his mask, glasses, shirt, and pants. Ext. V. #2 at 11:27. Now wearing only his boxers, Dunahue turns his back to the bars and places his hands in the trap to be cuffed. The outside door to the cell is opened and Lt. Herrington steps inside and cuffs Dunahue's hands behind his back. Ext. V. #2 at 11:45. With his face mask no longer in place, Dunahue now can be heard repeatedly coughing.

13.    Lt. Herrington tries to open the inside cell door, but the key does not work. Ext. V. #2 at 12:48. Another officer can be heard saying that someone gave Lt. Herrington the wrong key. Ext. V. #2 at 12:54 to 13:00. Lt. Herrington leaves, and, about one minute later, Sgt. Perkins returns with the correct key, opens the door, and removes Dunahue from the cell. Ext. V. #2 at 13:55 to 14:00.

14.    In the hallway, Dunahue allows shackles to be placed on his ankles. A leather tether is attached between his handcuffs and shackles.[14] As he stands in the

---

[14] In his Substituted Complaint, Dunahue refers to this form of restraint as being "hog-tied" and claims that it violated his constitutional rights. To the contrary, Warden Watson explains in paragraphs 13 and 14 of his Declaration that all staff at VSM are aware "that inmates at the VSM were required to be handcuffed in the back with a tether and leg restraints when they were moved . . . ." *Doc. 110-5 at 3*. Importantly, at no point, in Ext. V. #2 and #3, does Dunahue voice *any*

hallway, it is obvious Dunahue is a large and very powerfully built man. Ext. V. #2 at 14:25 to 14:38. Given his long history of committing violent acts against staff, Dunahue's size and strength make him a potentially dangerous prisoner to handle, even in full restraints.

15.    Once outside the cell, Dunahue is having no difficulty breathing, and appears to be in no apparent discomfort from the pepper spray and tear gas. He begins talking to a prisoner inside one of the isolation cells and once again complains about not getting his noon food tray. Lt. Herrington, Lt. Plummer, and Sgt. Perkins then begin to walk Dunahue to the shower. Ext. V. #2 at 14:21 to 15:19.

16.    Dunahue is placed in a shower stall, which has a barred door, with a trap for removing and attaching handcuffs. Ext. V. #2 at 15:20. Except for the trap, the rest of the door is covered with clear plexiglass. Ext. V. #2 at 15:20. From inside the shower, Dunahue complains that "I didn't see lunch, bro," and that he has now been without food for five hours. Ext. V. #2 at 15:24. Judging from his complaints, Dunahue was bothered more by missing his noon food tray than being exposed to the pepper spray and tear gas.

17.    From the time Dunahue is removed from his cell, until the end of Ext. V. #2, he is talkative and shows no signs of having any difficulty breathing. He

---

*complaints* about the way those restraints were applied, or them causing him any physical discomfort.

15

makes *no complaints* about Lt. Herrington's use of pepper spray and tear gas, or any "burning" from the pepper spray, which clearly failed to make contact with his skin. The only physical indication that he has been exposed to tear gas is an area of clear mucus under his nose. Ext. V. #2 at 15:49.

18.    After the shower door is closed and locked, Dunahue says, "*take these cuffs off so I can decontaminate, man.*" *Id.* at 15:42. Ext. V. #2 ends immediately after Dunahue makes that statement, without showing whether his handcuffs were or were not removed.

> **B.    Dunahue Received a Prompt and Adequate Decontamination Shower, Regardless of Whether His Hands Were Cuffed or Not**

19.    Ext. V. #3 begins with Dunahue standing naked behind the "fogged up" plexiglass covering the shower door. He is complaining in a loud and belligerent voice about how, *before the incident began*, the water to his cell had been cut off. Ext. V. #3 at 0:00 to 0:40.

20.    Lt. Herrington opens the shower cell door and places a plastic gown over Dunahue's head. Ext. V. #3 at 0:40. Dunahue's hands can be seen cuffed behind his back. Lt. Herrington reassures him that, after he is returned to his cell, the water will be turned on every two hours, as specified under VSM policy. Dunahue then complains about the unfairness of that policy. Ext. V. #3 at 1:02.

16

21.    When Dunahue steps from the shower, a tether is visible, connecting his cuffs to his shackles. Ext. V. #3 at 1:02. In his deposition, Dunahue testified that Defendants refused to remove his handcuffs, before starting his shower, which prevented him from using his hands and soap "to properly decontaminate when I was in the shower." *Doc. 110-10 at 44, 48-49*.

22.    In paragraph 19 of Lt. Herrington's Declaration, he states that, after Dunahue was placed in the shower, "his handcuffs were removed and he was allowed to take a shower." *Doc. 110-4 at 5*. Based on the videos, there is no way to know if Defendants removed Dunahue's cuffs after Ext. V. #2 ended and replaced them before Ext. V. #3 began (as Lt. Herrington's states in his Declaration), *or* if Dunahue's hands remained cuffed behind his back during his shower, as he claims in his deposition.[15]

23.    Regardless of whether Dunahue's hands were cuffed or uncuffed during his shower, *Dunahue admits, in his Statement of Facts, that his shower lasted for* "*five to seven minutes*." *Doc. 118 at 14*.

24.    Importantly, Ext. V. #3 begins with Dunahue complaining about the water in his cell being cut off several hours *before* the use of force incident began.

---

[15] While this creates a genuine issue of disputed fact, *it is not material* to the resolution of Defendants' qualified immunity defense. Even if Dunahue's hands remained cuffed for his five to seven minute shower, he has come forward with *no facts* suggesting that Defendants acted with deliberate indifference because he never communicated any inadequacies in his shower when it was over.

If there was any truth to Dunahue's claim that his cuffs were *not* removed before his shower began, *as he specifically demanded at the end of Ext. V. #2*, Ext. V. #3 undoubtedly would have begun with Dunahue loudly complaining to the camera *about that fact – not* about the water having been turned off in his cell several hours earlier.

25.    In his deposition, Dunahue describes how his decontamination shower was inadequate:

> I was able to move my body towards the shower nozzle. But, see, I was not able to remove the chemical agent from my skin and body because my hands were immobilized behind my back. I didn't have a towel. I didn't have a bar of soap. I didn't have any of the items or the ability to remove the chemical agent from my body. . . . There's not a person in this world who can wash his face if he is hogtied-style restrained. . . . I was not able to wash the mace from my body due to the fact I was hogtied-style restrained.

*Doc. 110-10 at 48*. Dunahue made *none* of those complaints to Defendants after he completed his shower. Ext. V. #3 at 0:00 to 1:04.

26.    Ext. V. #2 contains indisputable evidence that the one second or less burst of pepper spray did *not* make direct contact with Dunahue's skin. His deposition testimony about the need to use his hands and soap to "remove the chemical agent from my body" begs the real question of when *any* "chemical agent" ever came in contact with his body. In his deposition, Dunahue provided *no facts* to answer that question.

27.    During his deposition, Dunahue also testified that "they" edited out the camera footage of him taking his shower, with his hands cuffed behind his back, because "[i]t's too damning. You know, it makes them look guilty so they had to cut it out, you know." *Doc. 11-10 at 45*. Dunahue then described Defendants' alleged conduct, in such an entirely facetious way, that even *he* does not appear to believe *his own testimony*:

> And I'm just so ashamed that those good, upright, and you know, nice people [presumably the Defendants] would take and cut that part of the footage out so people like yourself and other judges can [*sic*] see that I was asking them repeatedly, "Ma'am [*sic*], would you please remove the leg irons and the handcuffs so I can take a proper shower and remove the chemical agents.

*Id*.

28.    If, as he now claims, his hands were cuffed behind his back, *during his five to seven minute shower*, Dunahue's deposition testimony fails to address *why*, after he was removed from the shower, *with the camera now rolling*, he stated *nothing* about: (1) being forced to shower with his hands cuffed behind his back; or (2) the way it allegedly prevented him from adequately decontaminating. The only *plausible reason* for Dunahue *not* to complain about any inadequacies in his shower, as soon as it was over, is because it was long enough to allow him to remove any chemical residue that *might* have made contact with his body.

29.    Because Dunahue voiced *no complaints* to Defendants about his shower, *regardless of whether his hands were cuffed or not*, the indisputable facts (as revealed in Ext. V. #3 at 0:00 to 1:04) establish that Defendants were *completely unaware* of anything suggesting that Dunahue's 5 to 7 minute shower was inadequate to allow him to decontaminate.[16] Dunahue has come forward with no plausible facts suggesting Defendants acted with "deliberate indifference," *i.e.*, they *knew* Dunahue's five to seven minute decontamination shower was inadequate and then *ignored* a known or potential risk to his health and safety.  Accordingly, whether Dunahue was or was not handcuffed during his shower is *not material* to the resolution of Defendants' qualified immunity defense.

## C.    Dunahue Received Prompt Medical Attention After the Incident Was Over

30.    In paragraph 22 of Lt. Herrington's Declaration, he states that, "Dunahue got medical help and saw the nurse twice on July 19, 2015." *Doc. 110-4 at 3*. The statement of Lt. Herrington is directly supported by the contemporaneous

---

[16] Ext. V. #2 makes it clear that little, if any, pepper spray made it through the sheet barrier, and, if it did, the spray did not reach Dunahue, who was in the back of the cell fully clothed, and wearing a full mask over his nose and mouth, eyeglasses, and a t-shirt wrapped around his face and head. The same extensive protection provided by Dunahue's clothing and mask also would have protected his skin, hair, and eyes from the tear gas. Thus, regardless of whether Dunahue's hands were cuffed or not during the shower, there is nothing to suggest that Defendants allowing him to stand in a shower for 5 to 7 minutes, under running water, would not be sufficient to allow him to decontaminate.  Given these undisputed facts, it would have been completely fair and reasonable for the Defendants to believe that the 5 to 7 minute shower was sufficient to remove the residual chemicals from Dunahue's skin and hair, even if his hands were cuffed behind his back – *especially since Dunahue voiced no complaints to them, when he emerged from the shower, about being unable to adequately decontaminate*.

medical notes of Nurse Mandy Roe, which are attached as Exhibit C to Defendants'

Motion for Summary Judgment. *Doc. 110-3*. According to Nurse Roe's notes:

> (1)    At 4:21 p.m. on July 19, 2015, she was called to "ISO 4 Cell 29 for a cell extraction of inmate [Dunahue]" who had "refused to come out and had barricaded himself in his cell with blankets." She reported Dunahue "never had direct contact with the OC (pepper spray)" but after tear gas was used he "caught the cuffs and was removed to the shower."
>
> (2)    After Dunahue was placed in the shower, but before the water was turned on, Nurse Roe checked Dunahue's "vital signs," which were "normal," with "oxygen saturation of 98%." She observed that Dunahue was "talking with no noted shortness of breath;" no complaints of pain to the eyes but "some redness noted." According to Nurse Roe, "no negative findings noted and inmate will be further assessed after decontamination."
>
> (3)    At 5:28 p.m. on July 19, 2015, she saw Dunahue again after he was returned to Cell 29. According to her notes, Dunahue told her "He's good and the chest pain is gone. Refused EKG and . . . vital sign recheck."

31.    These notes make it clear that Nurse Roe was present for the cell extraction, presumably so she could provide immediate medical attention for Dunahue *or* the Defendants, if it became necessary. She checked Dunahue's vital signs, within a few minutes after the incident ended, and they were all normal.

32.    According to Nurse Roe's notes, about one hour later, she went to Dunahue's cell for a follow-up exam. Dunahue told her he was "good," the "chest

pain was gone" and he declined her offer to administer an EKG and recheck his vital signs. Having been returned to his cell for about one hour, Dunahue made *no complaints* to Nurse Roe about: (1) his cell not being adequately decontaminated; (2) mace still "burning his body;" or (3) the need for another shower to decontaminate.

33.     In his deposition, Dunahue was asked if he saw medical professionals on July 19, 2015. He responded: "No. No. No. No, they falsified records, like they normally do here, under auspices of Director Kelley." *Doc. 110-10 at 54*.[17] Dunahue's effort to "explain away" these medical records, by making the far-fetched and unsubstantiated claim they were "falsified," is strikingly similar to his equally far-fetched and unsubstantiated claim that Defendants edited out the camera footage of him taking his shower because "[i]t's too damning." *Doc. 110-10 at 45*.[18]

34.     According to Dunahue, ADC policy required that, "after use of chemical agents, and things like that, you have a follow up visit by medical professionals. That never happens here." *Id. at 55*. While *admitting* a medical staff member came down to the shower to examine him after the incident, Dunahue testified Defendants "shoo[ed] the medical staff away." As a result, Dunahue

---

[17] In his Affidavit in response to the Defendants' Motion for Summary Judgment, Dunahue claims "medics falsified [medical] records on July 19, 2015." *Doc. 119 at 1*.

[18] It apparently did not occur to Dunahue that he was not videoed taking his shower to allow him some privacy.

testified "I visually saw medical professionals but I was not able to be tended by medical professionals." *Id. at 55*. Finally, Dunahue testified that he also did not see any medical professionals the next day, on July 20, 2015. *Id. at 56*.

35.    Dunahue has not come forward with *any facts* to support this entirely improbable and facially unbelievable claim of a "conspiracy," which extended all the way to the Director of the ADC, and resulted in the falsification of his medical records to reflect treatment he never received. Yet, Dunahue did not raise this alleged claim of records falsification in any of the grievances he filed after the incident, and, instead, waited until his deposition to do so.  Without offering any evidence to support this far-fetched claim, Dunahue has failed to create a genuine issue of disputed facts about the well documented medical care he received, promptly after the incident, as established by the contemporaneous notes of Nurse Roe.

36.    According to the medical notes of Nurse Barbara Boatner, she examined Dunahue at 3:50 p.m. on July 20, 2015, *the day after the incident*. His blood pressure and pulse were normal. At that time, Dunahue made *no complaints* about any difficulty breathing, skin irritation or burning, a sore throat, or red eyes. Instead, he complained only that the flooding in his cell "caused me to fall down on the cell floor. . . . I damaged my left hip." *Doc. 110-3 at 3*.[19]

---

[19] In his deposition, Dunahue also denied that he received medical care from Nurse Boatner on July 20, 2015. *Doc. 110-10 at 56*. Thus, it appears the "vast conspiracy" to falsify his medical records began on July 19 and extended through August, which means that most, if not all, of the

37.     Medical notes also reflect that, on July 25, 26, 28, and 29, nurses saw Dunahue in his cell and he voiced "no complaints or concerns" about his health, or any medical issues related to him being exposed to pepper spray and tear gas on July 19, 2015. *Id*. On July 31, 2015, CNA Bass provided Dunahue with new glasses. *Id. at 5*.

38.     On August 3, 2015, Dunahue was examined by Dr. Clowers. Dunahue told her "he needs medication for sinus drainage." She noted his "pulse ox is 98% . . . breath sounds are clear and equal bilateral. Has a slight friction rub in his upper anterior lobes. No wheezing, throat is pink, no drainage noted. Inmate states he feels a heaviness in his chest." The note reflects a chest x-ray was scheduled. These medical findings appear to be consistent with Dunahue having a cold, with accompanying sinus and chest congestion. *Id. at 7*. During segregation rounds on August 11 and 22, nurses noted that Dunahue voiced no health complaints. *Id*.

39.     These medical records establish that: (1) Dunahue received medical attention, both immediately after the incident and over the next two weeks; and (2) all of the health care professionals who examined Dunahue found that his vital signs were normal, and he was in no medical distress. Dunahue has come forward with no

---

nurses and medical professionals at VSM were part of the conspiracy. This fantastical story by Dunahue, which is supported by no facts, was conveniently created, during his deposition, to avoid having to admit that: (1) he received prompt medical attention after the incident ended; *and* (2) for several weeks thereafter, medical personnel continued to visit him in his cell to ask how he was doing and to check his vital signs.

plausible facts to create a genuine dispute about the well documented medical care he received shortly after the incident and continuing for a number of days thereafter.

### D.   Dunahue's Trip From the Shower Back to His Cleaned and Decontaminated Cell

40.   Lt. Herrington and Sgt. Perkins escorted Dunahue from the shower. As the shower door starts to close, Dunahue suddenly lunges at Lt. Plummer, who is operating the camera. After failing to make physical contact with Lt. Plummer, Dunahue spits at him.  Ext. V. #3 at 1:06 to 1:11. Lt. Herrington and Sgt. Perkins put their hands on Dunahue's shoulders to restrain him from attacking Lt. Plummer, turn Dunahue around, and begin escorting him back to his cell. Ext. V. #3 at 1:07 to 1:20.

41.   Dunahue talks with Lt. Herrington and Sgt. Perkins as he is escorted down the hallway. From the time he leaves the shower until he arrives back at Cell 29, Dunahue never coughs, blows his nose, sneezes, or appears to have any difficulty breathing.

42.   As they approach Dunahue's cell, a cleaning cart is in the hallway near the door. Sgt. Foote and another individual can be seen outside his cell, with a mop, and bucket. Sgt. Foote appears to be holding a squeegee. Ext. V. #3 at 1:52 to 2:04. This is indisputable evidence that, while Dunahue has been taking his shower and being examined by Nurse Roe, his cell was mopped and cleaned.

43.    As Dunahue enters his cell, he requests Lt. Herrington to turn the water on. Ext. V. #3 at 2:35. Lt. Herrington, Sgt. Perkins, Sgt. Foote, and Dunahue all enter the cell. Lt. Herrington requests Dunahue to lay down on the floor so his leg restraints can be removed. Ext. V. #3 at 2:36. When he does not comply, Lt. Herrington, Sgt. Perkins, and Sgt. Foote carefully lift Dunahue off his feet, slowly lower him to the floor, and remove his leg restraints. While that is taking place, Dunahue complains nonstop about a host of things, including the water to his cell being turned off, food issues, their "unnecessary use of force" in lowering him to the floor, and Lt. Herrington's earlier use of pepper spray and tear gas during the cell extraction. Lt. Herrington repeatedly tells Dunahue, in a soft voice, to calm down. Ext. V. #3 at 3:07, 3:11, and 3:24.

### E.    Dunahue Claims His Cell Has Not Been Cleaned and He Has "Mace On My Body" and Needs Another Shower

44.    With Dunahue's shackles removed, the three officers discuss when and how they should remove Dunahue's handcuffs. One officer starts to remove Dunahue's handcuffs and Lt. Herrington stops him and suggests it will be better for them to leave the cell, with Dunahue's hands cuffed behind his back, and then remove the cuffs and tether through the trap. Dunahue is allowed to stand, with his hands cuffed behind his back. Lt. Herrington, Sgt. Foote, and Sgt. Perkins exit the cell, and close the barred door. The success of Lt. Herrington's plan rests entirely on

Dunahue voluntarily complying with the order to step to the trap so the handcuffs can be removed. Lt. Herrington issues that order and Dunahue refuses to comply. Ext. V. #3 at 4:58.

45.    Dunahue is now standing, with his hands cuffed behind his back, inside his locked cell. He refuses to obey Lt. Herrington's orders to put his hands in the trap so his cuffs can be removed. He begins complaining that "mace" is "burning his body." Ext. V. #3 at 5:22. While Lt. Herrington clearly does not believe Dunahue, he tells him that he can get another shower shortly, as part of regular evening shower call. Dunahue says he needs another shower *now*. Ext. V. #3 at 5:37. Nothing about Dunahue's facial expression or body language suggests that he is in fact "burning" from "mace" on his body, a claim he is making for the first time – almost fifteen minutes *after* he completed his five to seven minute decontamination shower, about which he voiced *no complaint*.

46.    Dunahue also complains there is mace on his rack and the smell of "smoke" in his cell. Ext. V. #3 at 5:45 to 5:52.[20]  Lt. Herrington denies that there is mace on Dunahue's rack and explains to him that the cell has been completely cleaned. Ext. V. #3 at 2:15 to 2:18.

---

[20] It appears Dunahue uses the term "mace" to mean pepper spray and the term "smoke" to mean tear gas.

47.    During the three minutes that Lt. Herrington, Sgt. Foote, Sgt. Perkins, and Dunahue were all together inside the cell, none of them coughed, sneezed, blew or wiped their noses, or did anything to suggest they were having any difficulty breathing from any residual chemical residue. Ext. V. #3 clearly shows that the short burst of orange pepper spray, which had previously stained the sheet, cell bars, and a metal plate near the trap (*see* Ext. V. #2 at 2:59 to 3:08), has now been cleaned up and these bars no longer show any signs of orange spray (*see* Ext. V. #3 at 5:45 to 5:47). Similarly, the floor of the cell has been completely mopped and is now dry. Ext. V. #3 at 2:54. This is indisputable evidence that Dunahue's cell was thoroughly cleaned before he returned. Dunahue has come forward with *no facts* to controvert any of the indisputable evidence in Ext. V. #3.

48.    Lt. Herrington again tells Dunahue to step to the trap so his handcuffs can be removed. Dunahue responds that, if he complies with Lt. Herrington's order and relinquishes the cuffs, he will not be allowed to shower. He repeatedly states he has mace on his body and needs another shower. Ext. V. #3 at 6:00 to 6:48. Dunahue then says, I am "telling you in front of the camera" I am "burning real bad" and "I need another shower." Ext. V. #3 at 6:55-7:14. However, there is *nothing* about Dunahue's voice, facial expression, or body language that suggests he is in any pain or discomfort from a supposedly *delayed reaction* to "mace being all over my body." Everything about what Dunahue is doing and saying suggests that he is trying to

goad and annoy Lt Herrington, who clearly does not believe Dunahue's assertion he still has "mace all over his body" and needs an immediate shower.

49.    Lt. Herrington calls Major Malone. He can be seen and heard discussing the entire history of the incident with her. Lt. Herrington tells Major Malone that, even though he has already allowed Dunahue to have a thorough decontamination shower, he is now claiming he needs another one. Ext. V. #3 at 7:50 to 10:30.

50.    After he finishes the phone call, Lt. Herrington tells another officer outside the cell that he has spoken with Major Malone and he has been authorized to use pepper spray again, if necessary, to get Dunahue to comply with his order to step to the trap so his handcuffs can be removed. If Dunahue continues to refuse to comply with his orders, Lt. Herrington tells the officer he will be forced to use the pepper spray and they will have to put Dunahue through the decontamination process all over again. Ext. V. #3 at 10:32 to 10:59.

51.    Ext. V. #4 begins with Lt. Herrington returning to Dunahue's cell. He once again moves the three-sided plexiglass shield into position in front of the trap. He has a cannister of pepper spray in a holster on his belt. Lt. Herrington orders Dunahue to step to the trap and allow him to remove the handcuffs. Dunahue is now only wearing his boxers. He knows that, if he continues to refuse to comply with Lt. Herrington's orders, he will be sprayed, and this time the pepper spray will make direct contact with his skin. He again asks Lt. Herrington to turn the water on in his

cell. Lt. Herrington responds that the water will be turned on as soon as Dunahue steps to the trap and allows the handcuffs to be removed. Ext. V. #3 at 0:00 to 1:15.

52.    Dunahue finally steps to the trap and allows Lt. Herrington to remove the cuffs. As the outside door closes, water can be heard running inside Dunahue's cell. Ext. V. #3 at 1:20 to 2:03.

53.    In his Substituted Complaint (*Doc. 7 at 13*) and Statement of Facts (*Doc. 118 at 17*), Dunahue alleges that, as a result of his exposure to chemicals during the July 19, 2015 cell extraction, he still has "chest pain", "trouble breathing", "ghonorhea [*sic*] like effects when I urinate", and "[I] pass out frequently."

### F.    Dunahue's Inadequate Nutrition Claim

54.    After the incident, Dunahue was placed on behavior control for 72 hours and the ADC's alternative meal program for 7 days. *Doc. 110-2 at 23*.[21]

55.    The alternative meal program replaces an inmate's regular meals with a "nutritional loaf," which a prisoner receives no more than three times a day for seven days.[22] The ADC Food Service Administrator is responsible for the program and "shall ensure that nutritionally adequate alternative meal service recipes are

---

[21] Behavior control is a disciplinary action in which an inmate is allowed only a limited number of personal items, including a blanket, underwear, a paper gown, and a small quantity of toilet paper. Under certain circumstances, a prisoner can also be placed on the ADC's alternative meal plan. ADC Behavior Control Policy, *Doc. 110-6 at 2-3*.

[22] The ADC alternative meal policy states "Alternative meal service will be for seven (7) consecutive days, or twenty-one (21) meals, before the inmate returns to regular tray meal. The Unit Wardens may reduce the number of alternative meals if appropriate." *Doc. 110-9 at 2*.

available." The ADC Food Production Managers are responsible for ensuring "the [nutritional loaf] is properly prepared according to prescribed recipes." *Doc. 110-9 at 5*.

56.    In his Substituted Complaint, Dunahue alleges Lt. Plummer "ordered the CO's to deny me regular food for 7 days straight," and Lt. Herrington, Lt. Plummer, Sgt. Foote, and Major Malone "falsified records to justify putting me on frozen cornbread only diet for 7 days." *Doc. 7 at 9, 11*.[23]

57.    In his deposition, Dunahue testified that the nutritional loaves he received "had been in the freezer for over a year . . .were tasteless . . . microwave[d]," and "normally doesn't even come completely warm." *Doc. 110-10 at 69-70*. Finally, in his Response to Defendants' Motion for Summary Judgment, he added that the nutritional loaves "were old," lacked several ingredients listed in the ADC policy and were "loaded with salt." *Doc. 110-10 at 69-70*; *Doc. 117 at 10*.

58.    After consuming nutritional loaves for seven days, Dunahue was qualified to express his *opinion* that they were tasteless, not sufficiently warmed, and salty. However, he had *no personal knowledge* about the age or nutritional content of those loaves sufficient to create a fact question as to their nutritional value. *See Docs. 110-2 and Doc. 110-9*. Finally, Dunahue neither claims, nor offers any

---

[23] One of the exhibits to Defendants' Motion for Summary Judgment is the "Alternative Meal Service Order." *Doc. 110-2 at 17*. It specifies that the reason Dunahue was placed in the alternate meal program for seven days was because "inmate broke sprinkler during chow."

evidence, that he suffered a physical injury as a result of eating the nutritional loaves for seven days.

## IV.    Legal Analysis

### A.    Qualified Immunity

Defendants argue that all of Dunahue's claims should be dismissed based on qualified immunity.[24] To overcome this defense, Dunahue must show that: (1) the supporting facts, viewed in the light most favorable to him, establish a violation of his constitutional rights; and (2) those constitutional rights were clearly established such that a reasonable corrections officer would have known that his or her actions were unlawful. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Montoya v. City of Flandreau*, 669 F.3d 867, 872 (8th Cir. 2012). "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions." *Nelson v. Corr. Med. Services*, 583 F.3d 522, 528 (8th Cir. 2009). Finally, in applying this standard, the Eighth Circuit has cautioned that "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."

---

[24] Qualified immunity protects government officials from liability for monetary damages in a § 1983 action unless, at the time of the alleged violation, his or her conduct violated a clearly established federal statutory or constitutional right of which a reasonable person would have known. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741-742 (2011); *Pearson v. Callahan*, 555 U.S. 223, 231-232 (2009).

*Moore v. City of Desloge, Mo.*, 647 F.3d 841, 846 (8th Cir. 2001); *Ambrose v. Young*,

474 F.3d 1070, 1077 (8th Cir. 2007).

In analyzing whether Defendants are entitled to qualified immunity, I am

required to view the facts in a light most favorable to Dunahue. However, I am not

required to adopt his otherwise unsupported version of the facts if they are "blatantly

contradicted" by the indisputable evidence contained in Ext. V. #2, #3, and #4. *See*

*Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different

stories, one of which is blatantly contradicted by the record, so that no reasonable

jury could believe it, a court should not adopt that version of the facts for purposes

of ruling on a motion for summary judgment."). As the Eighth Circuit has succinctly

explained:

> "At the summary judgment stage, facts must be viewed in the light most
> favorable to the nonmoving party only if there is a 'genuine' dispute as
> to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167
> L.Ed.2d 686 (2007) (quoting Fed. R. Civ.P. 56(c)). If "opposing parties
> tell two different stories," the court must review the record, determine
> which facts are material and genuinely disputed, and then view those
> facts in a light most favorable to the non-moving party—as long as
> those facts are not so "blatantly contradicted by the record ... that no
> reasonable jury could believe" them. *Id.* "A plaintiff may not merely
> point to unsupported self-serving allegations, but must substantiate his
> allegations with sufficient probative evidence that would permit a
> finding in his favor," *Bass*, 418 F.3d at 872-73, without resort to
> "speculation, conjecture, or fantasy," *Moody v. St. Charles County*, 23
> F.3d 1410, 1412 (8th Cir.1994) (quotation marks and citation omitted).
> In sum, the evidence must be "such that a reasonable jury could return
> a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,
> 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790-91 (8th Cir. 2009).

### B.    The Supported Facts, Viewed in the Light Most Favorable to Dunahue, Do Not Establish That Defendants Violated His Constitutional Rights

#### 1.    Dunahue's Excessive Force Claim

Defendants argue that: (1) Lt. Herrington used pepper spray and tear gas, in a reasonable and appropriate way, to get Dunahue to comply with numerous direct orders to cuff up so he could be removed from his flooded cell; and (2) cuffing Dunahue's hands behind his back, putting shackles on his legs and connecting those restraints with a leather tether was the reasonable and appropriate way to move prisoners in VSM, as specified by ADC policies and regulations. *Doc. 112 at 9-12*. Accordingly, Defendants contend that none of their actions violated Dunahue's constitutional rights.

In evaluating Eighth Amendment excessive force claims, the core judicial inquiry is whether the relevant force was applied in a good-faith effort to maintain discipline, or maliciously and sadistically for the purpose of causing harm. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). In making that determination, courts must consider: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the injury inflicted. *See Ward v. Smith*, 844 F.3d 717, 721-722 (8th Cir.

2016); *Walker v. Bowersox*, 526 F.3d 1186, 1188 (8th Cir. 2008); *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002).

The Eighth Circuit has recognized that the limited use of chemical agents by a corrections officer, to control recalcitrant inmates, constitutes a "tempered response" when compared to other forms of force; however, additional factors may need to be considered in evaluating whether the officer who used that force is entitled to qualified immunity: (1) was a warning given before the chemical agents were used; (2) was there a purpose for using the chemical agents, other than to inflict pain; (3) were "super-soaker" quantities of the chemical used; (4) was the inmate not allowed the inmate to wash off the chemical for a prolonged period of time; and (5) in addition to using the chemical agents, was physical force used. *Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014); *Walker*, 526 F.3d at 1189; *Treats*, 308 F.3d at 873; *Lawrence v. Bowersox*, 297 F.3d 727, 730, 732 (8th Cir. 2002); *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000)).

Ext. V. #1 and #2 establish *beyond any doubt* that: Lt. Herrington's limited and tempered use of pepper spray and then tear gas was necessary to get Dunahue to comply with his orders to "accept the cuffs" so he could be removed from his flooded cell; Dunahue was given warnings before Lt. Herrington fired the short burst of pepper spray and, again, before he deployed tear gas; the *sole purpose* for Lt. Herrington using those chemicals was to get Dunahue to comply with his orders; no

other physical force was used by any of the Defendants; and, as soon as the incident ended, Dunahue was taken directly to the shower to decontaminate and then be examined by Nurse Roe.

Viewing these undisputed facts, in a light most favorable to Dunahue, no reasonable factfinder could conclude that any of the Defendants used excessive force in removing Dunahue from his cell, placing him in restraints,[25] and escorting him to the shower. To the contrary, Ext. V. #2 and #3 establish that, throughout this incident, the Defendants acted with *commendable restraint* in dealing with Dunahue, who lived up to his well-earned reputation as a defiant, belligerent, and dangerous prisoner.

Accordingly, I recommend the Court grant Defendants' Motion for Summary Judgment on Dunahue's claim that they used excessive force against him in removing him from his cell, or at any point thereafter.

---

[25] ADC regulations *require* that VSM prisoners have their hands cuffed behind their backs, shackles placed on their legs, and a tether attached between the cuffs and shackles before they can be escorted in hallways. The justification for those restraints is obvious – many of the prisoners in VSM are violent and those restraints are necessary for the safety of the inmate and the guards. Ext. V. #2 and #3 conclusively establish that, in placing those restraints on Dunahue, something he called being "hog-tied," his constitutional rights were not violated by any of the Defendants.

## 2. Dunahue's Claim Defendants Were Deliberately Indifferent to His Need to Adequately Decontaminate After the Incident

It is *undisputed* that, at the end of Ext. V. #2, Dunahue demands that Defendants remove his handcuffs "so I can decontaminate." Ext. V. #2 at 15:42. It is also *undisputed* that, after Dunahue completed his shower, he made *no complaints* to Defendants about: (1) his handcuffs not being removed, as he demanded before his shower started; or (2) any other aspect of his decontamination shower being inadequate. *See* Ext. V. #3 at 0:00 to 2:10.

To overcome Defendants' qualified immunity defense, Dunahue must come forward with facts demonstrating that Defendants were "deliberately indifferent," *i.e.*, they "knew and disregarded" a "substantial risk of harm" to Dunahue's "health and safety" in the way they administered his five to seven minute decontamination shower. *Farmer*, 511 U.S. 825 at 837. Even if Dunahue remained handcuffed during his shower, Ext. V. #3 establishes beyond any doubt that, after Dunahue finished his shower, *he said nothing* to Defendants about being unable to adequately decontaminate, and he never complained about any aspect of his shower. As a result, there are *no facts* which support Dunahue's claim that Defendants were deliberately indifferent to his need to decontaminate or that they *knew* of any "risk of harm" to Dunahue's "health and safety" related to allowing him to take a five to seven minute shower, regardless of whether he was in handcuffs or not.

Viewing these undisputed facts, in a light most favorable to Dunahue, no reasonable factfinder could conclude that Defendants acted with deliberate indifference by allowing Dunahue to take a long decontamination shower promptly after they removed him from his cell. Accordingly, I recommend that the Court grant Defendants' Motion for Summary Judgment on Dunahue's claim that they were deliberately indifferent in the way they administered his five to seven minute decontamination shower.

### 3.    Dunahue's Inadequate Medical Care Claim

Dunahue's own contemporaneous medical records, generated on and after July 19, 2015, establish that: (1) almost immediately after the incident, Nurse Roe examined him and found all of his vital signs were normal, with a SAT O2 of 98%; (2) about an hour later, she saw him again in his cell, and he reported he "is good" and the "chest pain is gone;" and (3) over the next two weeks numerous other nurses and healthcare professionals saw Dunahue and he made *no complaints* about any health problems related to the July 19, 2015 incident.[26] In Lt. Herrington's sworn Declaration, he states that "Dunahue got medical help and saw the nurse twice on July 19, 2015."

---

[26] Dunahue was seen by nurses on July 20, 25, 26, 28, and 29. On all of those dates, he expressed no health related complaints associated with the July 19, 2015 incident. *Doc. 110-3.*

In his deposition, Dunahue testified that ADC Director Wendy Kelley and the Defendants conspired to "falsify" his medical records. However, he offered *no facts* to support this far-fetched claim. Dunahue's creative storytelling falls far short of the kind of evidence required to create a genuine issue of disputed fact about the well documented medical care Dunahue received on and after July 19, 2015.[27] *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (Nonmoving party's allegations must be supported by "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.").

In *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), the Court held that a prison official is "deliberately indifferent" if the official "knows of and disregards" a "substantial risk of serious harm" to "inmate health or safety." In *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016), the Court explained that "the deliberate indifference standard [articulated in *Farmer*] has both objective and subjective prongs," which require a prisoner to prove that: (1) "he suffered from an objectively serious medical need [the objective prong]"; and (2) the defendants "actually knew of but deliberately disregarded [the prisoner's] serious medical need [the subjective prong]."

---

[27] A party cannot defeat a summary judgment motion by asserting "the mere existence of *some* alleged factual dispute between the parties"; the party must assert that there is a "*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)).

For a factual issue to be genuine, it must have a real basis in the record such that "a reasonable jury could return a verdict for the nonmoving party" on the disputed issue. *Woods v. Daimler Chrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

Dunahue's own contemporaneous medical records, *which he has not controverted with any plausible evidence*, establish that: (1) Defendants provided him with prompt medical attention almost immediately after the incident; (2) he continued to be seen regularly by medical personnel for the next several weeks; and (3) in his conversations with the healthcare professionals, he reported *no medical problems* related to his brief exposure to pepper spray and tear gas on July 19, 2015.

Viewing these facts, in a light most favorable to Dunahue, no reasonable factfinder could conclude that Defendants were deliberately indifferent to him being promptly examined by medical professionals after he was exposed to pepper spray and tear gas. To the contrary, the Defendants were so concerned about *everyone's safety* that they made sure Nurse Roe was present for the cell extraction and that she accompanied them back to the shower area to examine Dunahue. These medical records make it clear that Dunahue has fashioned his inadequate medical care claim "from the whole cloth."

Accordingly, I recommend that the Court grant Defendants' Motion for Summary Judgment on Dunahue's inadequate medical care claim.

### 4. Dunahue's Claim Defendants Returned Him to a Cell That Had Not Been Cleaned and Decontaminated

Ext. V. #3 contains indisputable evidence that, *before* Dunahue was returned to his cell, it was cleaned and decontaminated. Based on these undisputed facts, Defendants argue they are entitled to qualified immunity.

When Dunahue was removed from his cell, the floor was flooded with water. Ext. V. #3 contains indisputable evidence that, when he is returned to the cell, fifteen or twenty minutes later, the water on the floor of the cell was gone. Ext. V. #3 at 2:42 to 3:28. The video also shows a cleaning cart outside the cell, along with a mop, mop bucket, and squeegee used to clean the cell. Ext. V. #3 at 1:51 to 2:04. The orange stain on the cell bars and metal plate near the trap, which was visible in Ext. V. #2, is now gone. *Compare* Ext. V. #2 at 3:15 *with* Ext. V. #3 at 5:56. All of these undisputed facts establish that Defendants returned Dunahue to a cell that had been cleaned and decontaminated.

Ext. V. #3 shows Lt. Herrington, Sgt. Perkins, Sgt. Foote, and Dunahue entering the cell, where all four men remain for almost three minutes, while Dunahue is placed on his stomach, on the floor, and his leg shackles and the tether that connects them to the handcuffs are removed. During this time, no one inside the cell coughs, sneezes, wipes or blows their nose, or does anything that suggests any chemical residue remains in the cell. Thus, Defendants' own personal observations

and sensory impressions, from inside the cell, further informed them that they had returned Dunahue to a clean cell.

By the time Defendants leave the cell, Dunahue is visibly upset. He begins complaining about a host of things from his water being turned off earlier in the day, to feces remaining in the toilet, to the noon food tray he did not receive. Ext. V. #3 at 5:00 to 5:20. Lt. Herrington orders Dunahue to step to the trap so his handcuffs can be removed. He refuses to comply with the order. Ext. V. #3 at 5:26.

Dunahue then begins to loudly assert, *for the first time* since completing his decontamination shower, that he has "mace on my body," which is "burning" him. He demands to be allowed to take another shower. Ext. V. #3 at 5:22. As Dunahue voices these complaints about "burning" all over his body, he is *not* coughing, sneezing, wiping a runny nose, or giving any indication he is short of breath. Lt. Herrington clearly does not believe that Dunahue is having a "delayed reaction" to "mace" all over his body, especially after he just completed a long decontamination shower. Nevertheless, he tells Dunahue he can have a shower shortly, as part of evening shower call. Ext. V. #3 at 5:33 to 5:35.[28]

---

[28] In his Substituted Complaint, Dunahue does *not* assert a claim that Defendants were deliberately indifferent to his need for a second decontamination shower. Likewise, in his fully exhausted grievances (VSM15-3168, VSM15-3210, VSM15-3417, VSM15-3418, and VSM15-3419), Dunahue never complains about Defendants not allowing him a second decontamination shower, as he demanded once he was returned to his cell. *Doc. 33-3*. Instead, Dunahue waited until his deposition to assert this claim for the first time.

Dunahue's failure to raise this claim in properly exhausted grievances and then assert it in his Substituted Complaint means that it is not properly before the Court. However, rather than

Lt. Herrington is finally successful in convincing Dunahue to step to the trap so he can remove the handcuffs, but only *after* he has had to return to the cell with pepper spray and explained to Dunahue he will have to use it unless he agrees to allow the handcuffs to be removed. As Lt. Herrington closes the steel outside door to Dunahue's cell, water can be heard running inside cell. Ext. V. #4 at 2:00 to 2:02. Thus, if Dunahue genuinely believed he needed to wash off any chemical residue that still remained after his recently completed decontamination shower, Lt. Herrington provided Dunahue with two good options for doing so: (1) the sink in his cell, which now had running water; *and* (2) a shower as part of evening shower call.

Viewing all of these undisputed facts, in a light most favorable to Dunahue, no reasonable factfinder could conclude that any of the Defendants acted with deliberate indifference in returning him to his cell, which had been cleaned and decontaminated. Similarly, no reasonable factfinder, viewing these facts in a light most favorable to Dunahue, could conclude that any of the Defendants were deliberately indifferent in the way they responded to his demand for a second shower, which he raised only after he was returned to his cell, having voiced *no complaints* about the decontamination shower he completed just fifteen minutes earlier.

---

using this pleading deficiency as the basis for dismissing this claim, I have elected to address it on the merits.

43

Accordingly, I recommend that the Court grant Defendants' Motion for Summary Judgment on Dunahue's deliberate indifference claims which allegedly arose after he was returned to his cell following his decontamination shower.

### 5.    Dunahue's Conditions of Confinement Claim Based on Inadequate Nutrition

Dunahue alleges that, following the incident on July 19, 2015, Defendants and Major Malone put him on a diet of "frozen cornbread" for seven days. At the screening stage, the Court construed this allegation as stating an inadequate nutrition claim, and allowed it to proceed.

In his deposition, Dunahue admitted the "frozen cornbread" was in fact microwaved nutritional loaf that was served to VSM inmates as part of the alternative meal plan policy. *Doc. 110-10 at 69-70*. Dunahue testified that "normally [the nutritional loaf] doesn't even come completely warm . . . a lot of time, it comes half frozen, half warmed." *Id. at 70*. In his Response to the Defendants' Motion for Summary Judgment, Dunahue added that the nutritional loaf he received did not contain many of the ingredients listed in the recipes contained in the ADC's alternative meal plan policy. *Doc. 117 at 10*. Dunahue has never alleged that he suffered *any physical injury* caused by receiving nutritional loaf diet for seven days.

In Defendants' summary judgment papers, they argue that: (1) placing Dunahue on the alternative meal plan for seven days was appropriate and consistent with VSM policy, given the conduct of Dunahue before and during the incident; (2)

the nutritional loaf "poses no constitutional issues, as a nutritional matter or as a disciplinary one"; (3) the nutritional loaf contained the necessary and appropriate ingredients; and (4) in his pleadings and deposition testimony, Dunahue did not allege that he suffered *any physical injury* from being on the alternative meal plan for seven days.

Dunahue contends that the nutritional loaf was not adequately warmed before it was served, and in his opinion (unsupported by any facts) it did not contain some of the ingredients listed on the recipe. These claims simply do not rise to the level of a constitutional violation under the Eighth Amendment. *See Brown-El v. Delo*, 969 F.2d 644, 646, 648 (8th Cir. 1992) (inmate who claimed cold food he received during 10 days of disciplinary detention caused cramps, nausea and constipation failed to state a constitutional violation); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (prison officials entitled to judgment as a matter of law where plaintiff "presented no evidence that the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food.").[29]

---

[29] *See McEachin v. McGuinnis*, 357 F.3d 197, 199-201 (2d Cir. 2004) (affirming district court's Rule 12 dismissal of Eighth Amendment claim alleging that inmate was placed on a restricted diet consisting of "loaf" for seven days); *Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir. 1986) (seven days of food loaf failed to state a claim for Eighth Amendment violation); *Alex v. Stalder*, 225 Fed.Appx. 313 (5th Cir. 2007) (unpublished) (the serving of food loaf, without more, does not give rise to an Eighth Amendment violation); *Griffis v. Gundy*, 47 Fed.Appx. 327 (6th Cir. 2002) (unpublished) (citing *Cunningham v. Jones*, 567 F.2d 653, 656 (6th Cir. 1977)) (a diet of food loaf does not violate the prohibition against cruel and unusual punishment, because it has

Finally, apart from presenting no facts to support his *opinion* that the nutritional loaf did not contain all of the proper ingredients, Dunahue has not demonstrated that any of the Defendants had any personal involvement in preparing the nutritional loaf or knew it was being prepared in a way that was nutritionally inadequate.[30] Thus, Dunahue has come forward with no facts suggesting that any of the Defendants, in placing him on the alternative meal plan, acted with deliberate indifference to a known risk that it would pose any danger to his health or safety.

Accordingly, I recommend that the Court grant Defendants' Motion for Summary Judgment on Dunahue's conditions of confinement claim based on him receiving allegedly inadequate nutrition during the seven days he was on the alternative meal plan.

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendants' Motion for Summary Judgment, *Doc. 110*, be GRANTED as to all of Dunahue's claims against the remaining Defendants, and this case be DISMISSED, with prejudice.

---

been shown that these loaves meet nutritional and caloric requirements for humans); *Gates v. Huibrecrtse*, 69 Fed.Appx. 326 (7th Cir. 2003) (unpublished) (providing an inmate with a food loaf for seven days is not a violation of the Eighth Amendment); *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993) (temporary food loaf diet did not violate Eighth Amendment).

[30] The alternative meal policy states that the ADC Food Service Administrator and Food Production Managers are responsible for ensuring the nutritional loaf is prepared correctly. *Doc. 110-9 at 4-5.*

2.    The Court CERTIFY, pursuant to 28 U.S.C. § 1915(a)(3), that an *in forma pauperis* appeal from any Order adopting this Recommendation would not be taken in good faith.

Dated this 21st day of May, 2019.

_____
UNITED STATES MAGISTRATE JUDGE